IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

KENNETH OAKES                                                                    PLAINTIFF

VS.                                          CIVIL NO. 06-3076

MICHAEL J. ASTRUE,[1]
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION                     DEFENDANT

## MEMORANDUM OPINION

Kenneth Oakes ("plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act

("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of

the Social Security Administration denying his application for disability insurance benefits ("DIB")

under Title II of the Act.

## I.    Background:

The application for DIB now before this court was filed in December 1, 1995, alleging an

onset date of December 31, 1987, due to a low blood platelet count.  (Tr. 90-92, 114).  An

administrative hearing was held on February 16, 2005.  (Tr. 267-299).  The Administrative Law

Judge ("ALJ"), entered an unfavorable decision, which was reversed and remanded by the United

States District Court for the District of Colorado on August 24, 2001.  (Tr. 628-639).  A second

administrative hearing was held on June 19, 2002, resulting in a second  unfavorable decision dated

November 14, 2002.  (Tr. 643-649).  Plaintiff appealed this determination to the Appeals Council

and the case was again remanded to the Commissioner on September 10, 2003.  (Tr. 617).  A third

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should, therefore, be substituted for Jo Anne B. Barnhart as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

administrative hearing was then held on June 7, 2005.  Plaintiff appeared and was represented by counsel.  (Tr. 617).

On August 22, 2006, the ALJ entered a written opinion concluding that plaintiff's date last insured was September 30, 1993.  (Tr. 618).  He concluded that plaintiff's impairments were severe but determined that they did not  meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4.  The ALJ then found that plaintiff retained the residual functional capacity ("RFC") to perform a full range of light work.  As such, he determined that plaintiff could return to his past relevant work ("PRW") as a sales manager, merchandise manager, and consultant. (Tr. 619).

At the time of the most recent administrative hearing, plaintiff was fifty-five years old and possessed a high school education.  (Tr. 270).  The record reveals that he had PRW experience as a yard manager, drywall salesperson, sales manager, and consultant.  (Tr. 647, 1207-1208).

Because this case had previously been remanded by the court, it did not need to be represented to the Appeals Council.  *See* 20 C.F.R. § 404.984.  Accordingly, plaintiff filed his Complaint with this Court on December 22, 2006.  (Doc. # 1).  This case is before the undersigned by consent of the parties.  Both parties have filed appeal briefs, and the case is now ready for decision.  (Doc. # 9, 10).

**II.    Standard of Review:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir.

AO72A
(Rev. 8/82)

2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

     A.      **The Evaluation Process**:

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)(c).  A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.  *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require his to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003).  Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**B.**     **Evidence Presented:**

Plaintiff has a long history of idiopathic thrombocytopenic purpura.[2]  (Tr. 245, 555, 972). Further, the evidence indicates that plaintiff crushed his left ankle in 1972.  (Tr. 244).

An ultrasound of plaintiff's thoracic spine and abdomen was performed on February 15, 1989. (Tr. 547).  The results revealed only a single gallbladder calculus (stone) without any evidence of obstruction.  However, the thoracic spine was unremarkable.  (Tr. 547).

---

[2]     Idiopathic thrombocytopenic purpura (ITP), also called immune thrombocytopenic purpura, is a bleeding disorder in which the blood has difficulty clotting due to an unusually low number of platelets. *See* Idiopathic Thrombocytopenic Purpura, *at* www.mayoclinic.com.  People with idiopathic thrombocytopenic purpura, because of their low platelet count, tend to bruise easily and bleed longer when injured. *Id*.

On August 11, 1989, plaintiff was treated for episodes of lightheadedness by Dr. N. S. Prakash. (Tr. 541-542). A physical exam revealed only a grade I/VI (barely audible) systolic ejection murmur over the left sternal border. No other abnormalities were noted. A stress test was performed, and was negative for myocardial ischemia. Dr. Prakash diagnosed plaintiff with probable inner ear problems and possible status post lumbosacral strain. He noted that plaintiff had no specific symptoms palpitations except on one occasion associated with his lightheadedness. As such, Dr. Prakash found no significant cardiac problems. He then recommended that plaintiff take Dristan regularly to treat his allergy problems. (Tr. 542).

On August 13, 1991, plaintiff was treated for neck pain. (Tr. 414). X-rays revealed mild degenerative joint disease with muscle spasm. (Tr. 502). Plaintiff was prescribed Soma and Motrin. (Tr. 414).

On October 15, 1991, plaintiff complained of pain in his left ankle and hearing loss. (Tr. 413). He was diagnosed with nicotine dependence, borderline hypertension, poor cardiovascular fitness, hearing loss, and osteoarthritis of the left ankle. (Tr. 413).

On April 8, 1992, plaintiff fell while working and fractured his right hand. (Tr. 404). On August 22, 1992, Dr. Carol McMullin prescribed a wrist splint and advised him to follow-up if his hand did not improve. (Tr. 404, 497).

On August 7, 1992, plaintiff was treated by Dr. McMullin for left ankle pain and swelling. (Tr. 402). X-rays revealed degenerative disc disease at the L5-S1 level and a deformed distal tibia and fibula with evidence of osteoarthritis. (Tr. 496). Dr. McMullin diagnosed him with

5

questionable allergic rhinitis, osteoarthritis, lower back pain causing sciatica, and ankle pain.  He prescribed Motrin, Ami-Tex LA, Disobrom, inhalers, and lower back exercises.  He also referred plaintiff to an orthopaedic surgeon for consultation.

On October 8, 1992, plaintiff was evaluated by Dr. W. E. George, an orthopaedic surgeon. (Tr. 243-244).  X-rays of his left foot showed a healed fracture with extensive degenerative changes and lot of anterior lipping and osteophytosis.  (Tr. 243).  Dr. W. E. George diagnosed him with advanced post-traumatic arthritis of the left ankle.  (Tr. 244, 553).

In December 1992, plaintiff dislocated his right ring finger while working.  (Tr. 397). Although he pulled it back into place, it remained swollen and stiff.  As such, plaintiff was prescribed physical therapy, which he completed in May 1993.  (Tr. 391-397).

On August 31, 1993, plaintiff sought treatment for a frontal headache radiating down his back and his spine, body aches, low grade fever, diarrhea, and loss of appetite.  (Tr. 389).  Peter Adams, a physician's assistant, diagnosed plaintiff with probable viremia with associated headache, now improving.  He prescribed Anaprox and Tylenol, as well as increased fluids.  (Tr. 389).

On September 4, 1993, while vacationing in California, plaintiff's headache returned.  (Tr. 245).  He was taken to the hospital and admitted after a CT scan revealed an idiopathic cerebral subarachnoid hemorrhage.  (Tr. 245-285).  Upon admission, plaintiff had a blood platelet count of 60,000.  (Tr. 246).  After a transfusion and a course of steroids, it rose to 152,000.  He was then placed on a subarachnoid hemorrhage/aneurysm protocol, which included anticovulsants, nimodipine, and fluid hydration.  Plaintiff was observed and kept sedated over the course of the next

6

ten days.  His headache slowly improved and a repeat spinal tab indicated that the bleeding had

stopped.  Plaintiff was released on September 16, 1993.  (Tr. 245).  Dr. John Aryanpur counseled

plaintiff regarding his platelet count and the problems alcohol abuse could cause him with regard to

his platelet count.  (Tr. 246).

A September 11, 1993, record noted that plaintiff was a salesman of automatic staplers for

dry walling.  (Tr. 260).  Dr. Cory Spencer noted that plaintiff's thrombocytopenia was cyclic.  (Tr.

260, 263).

On September 20, 1993, Dr. Aryanpur wrote a letter to plaintiff's treating doctor, Dr.

Johnson, indicating that he had treated plaintiff while in California.  (Tr. 286-287).  He stated that

plaintiff's platelet count at the time of discharge was 132,000 and that plaintiff had abstained from

alcohol during the entire course of his hospitalization.  Dr. Aryanpur was of the opinion that plaintiff

suffered an idiopathic subarachnoid hemorrhage which was exacerbated by his low platelet count.

He indicated that plaintiff's prognosis was very good from a neurological standpoint.  Further, Dr.

Aryanpur stated that plaintiff was very anxious to begin treatment and had already contacted AA.

(Tr.286-287).

On September 24, 1993, Dr. Steven Johnson noted that plaintiff was status post subarachnoid

hemorrhage and was currently showing significant improvement with no residual deficits.  (Tr. 386).

He also acknowledged plaintiff's family history of familial thrombocytopenic purpura.  Dr. Johnson

opted to follow Dr. Aryanpur's suggestions and limit plaintiff to minimal activities over the next six

weeks with a slow increase in activities thereafter.  Plaintiff was directed not to return to work for

at least six weeks and to followup in two weeks, unless his symptoms increased in intensity. (Tr. 386).

On October 12, 1993, plaintiff reported some problems with sleep apnea. (Tr. 384). Dr. Johnson also indicated that plaintiff's diastolic blood pressure had been elevated while in the hospital. However, with a decrease in stress and alcohol, plaintiff's pressure reading was normotensive. (Tr. 384).

On November 26, 1993, Dr. Johnson noted that plaintiff had been doing fairly well status post recent subarachnoid hemorrhage. (Tr. 375). Plaintiff reported occasional occipital headaches that tended to occur when bending over. (Tr. 375). Since the time of his subarachnoid hemorrhage, he had felt some fatigue, but this was slowly improving. (Tr. 375). Plaintiff was taking Prozac and reported that he was an alcoholic who had quit drinking about three years ago. He was using AA, but experienced occasional binges every several months lasting about a day. (Tr. 375). Plaintiff's only exercise was at work where he stated that he was on his feet most of the time. (Tr. 375). Records indicate that plaintiff worked selling tools for drywall. (Tr. 375).

Dr. Johnson reported in July 1994 that he had been following plaintiff's blood platelet counts. (Tr. 371). He noted that plaintiff's platelet counts were in the 80,000-90,000 range, and stable. The plan was to continue to monitor his platelet level every 1-2 months. (Tr. 371).

In October 1994, Dr. Johnson assessed plaintiff with osteoarthritis of his left ankle secondary to prior trauma. (Tr. 369). He noted that plaintiff's symptoms were increasing in intensity. (Tr. 369).

## II.   **Discussion:**

At issue in this case is whether plaintiff was disabled between December 31, 1987, plaintiff's alleged onset, and September 30, 1993, plaintiff's date last insured.  *See Pyland v. Apfel,* 149 F.3d 873, 876 (8th Cir. 1998) (in DIB cases, plaintiff must establish disability before expiration of insured status); *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997) ("we will only consider an individual's medical condition as of the date she was last insured"); *Fisher v. Shalala*, 41 F.3d 1261, 1262 (8th Cir. 1994) (claimant required to show existence of disability prior to the expiration of insured status). Although the record contains a large quantity of medical evidence dated after October 1, 1993, we will only consider evidence dated after this time period if it reflects the status of plaintiff's condition on or before his date last insured.  *See Martonik v. Heckler*, 773 236, 240 (8th Cir. 1985) (holding that both objective and subjective evidence must be considered, including "medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status because it may bear upon the severity of the claimant's conditions before the expiration of his or her insured status").

### A.   **Listing 7.06 - Chronic Thrombocytopenia:**

In his brief, plaintiff alleges that the ALJ erred in determining that plaintiff's impairment did not meet or equal Listing 7.06 (chronic thrombocytopenia).  (Doc.# 9).  We note, however that this listing requires the plaintiff to have platelet counts repeatedly below 40,000/cubic millimeter, along with at least one spontaneous hemorrhage, requiring transfusion, within the 5 months preceding adjudication; or an intracranial bleeding within 12 months prior to adjudication.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 7.06.  As evidenced by the previously cited medical records, during the relevant

time period, plaintiff's platelet count did not drop below 40,000.  In fact, at the time plaintiff was admitted to the hospital due to problems associated with a subarachnoid hemorrhage/aneurysm, his platelet count was 62,000.  (Tr. 245).

While we are cognizant of the fact that plaintiff's levels did drop 40,000 in 1995, 1997, and 2001, the platelet counts recorded between 1987 and 1993 were not this low.  (Tr. 301, 364, 588, 949-950).  Further, we note evidence of only one spontaneous hemorrhage or intracranial bleed, which occurred in September 1993, more than 2 years prior to the filing of plaintiff's application for DIB, and well outside of the 12 month or 5 month limitation prescribed by the statute.  There are no further hemorrhages or intracranial bleeds recorded.  Accordingly, the ALJ was correct in concluding that plaintiff does not meet the criterion for listing 7.06.

### B.    **Subjective Complaints:**

Therefore, we must review the evidence to determine whether plaintiff's condition is equal in severity to listing 7.06.  To do so, we will first address the ALJ's assessment of plaintiff's subjective complaints.  The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to:  (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.

10

*Id.* As the United States Court of Appeals for the Eighth Circuit recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's complaints were not fully credible. The testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

As previously mentioned, the medical evidence reveals that plaintiff suffers from idiopathic thrombocytopenic purpura and osteoarthritis of his left ankle. However, in spite of these impairments, plaintiff has continued to work on at least a part-time basis. *See* 20 C.F.R. §§ 404.1571, 416.971; *Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003) (holding that ability to perform part-time work belied plaintiff's claim of disability). From 1989 until 1994, plaintiff owned two businesses.[3] One business assembled, repaired, and sold drywall tools. (Tr. 36-41). In fact, medical records indicate that plaintiff has worked for quite sometime with these impairments. (Tr. 34, 36-37, 41, 322, 375, 397, 404). *See Gowell v. Apfel*, 242 F.3d 793, 798 (8th Cir. 2001) (claimant worked with his impairments for years). Although the ALJ did not consider this work to be substantial gainful activity (due to limited earnings), he rightfully noted that plaintiff's ability to perform this level of activity contradicted his allegations of total disability. Clearly, had plaintiff's

---

[3]We note that plaintiff's date last insured in September 30, 1993. Although he owned these two businesses until December 1994, plaintiff testified that he did not take a salary for himself. (Tr. 43-44). Instead, he put all of the money back into the company. Therefore, there was little, if any, earnings to report to the IRS.

AO72A
(Rev. 8/82)

impairments been as severe as alleged, we do not believe he would have been able to continue working.

Further, while the evidence does reveal that plaintiff suffered an idiopathic cerebral subarachnoid hemorrhage in September 1993, it also indicates that plaintiff recovered from this event. (Tr. 245-285). In fact, Dr. Aryanpur, even noted that plaintiff's prognosis was very good from a neurological standpoint. (Tr. 286-287). In November 1993, Dr. Johnson even indicated that plaintiff had been doing fairly well status post recent subarachnoid hemorrhage. (Tr. 375). Although plaintiff was experiencing some fatigue at this time, Dr. Johnson stated that his fatigue was also improving. (Tr. 375). In fact, as late as July 1994, records indicate that plaintiff's platelet levels were stable. (Tr. 371).

As previously stated, the Court is aware that plaintiff's idiopathic thrombocytopenic purpura began to deteriorate in 1995. Records indicate that his platelet levels fell below the listing requirements on at least 3 separate occasions. We cannot, however, equate plaintiff's condition in 1995 with his condition in 1993, given the fact that we do have medical records indicating that plaintiff's platelet levels were well above the statutory requirement. The medical evidence dated during the relevant time period simply does not indicate that plaintiff suffered from a disabling impairment at that time.

With regard to plaintiff's ankle condition, we note that the evidence reveals that plaintiff suffered a crushed ankle in 1972 and was diagnosed with osteoarthritis. However, the medical evidence indicates that plaintiff did not begin to suffer from significant problems related to his ankle

12

until October 1994.  (Tr. 369).  Thereafter, a decision was noted that plaintiff would likely need to undergo fusion surgery at some point in the future.  The records dated during the relevant time period do not indicate that plaintiff's condition was as severe as noted beginning in October 1994.

Plaintiff's own reports concerning his activities of daily living also contradict his claim of disability.  Plaintiff reported an ability care for his personal hygiene, cook, do some light house cleaning, "pudder around" in his garage, help assemble small tools, offer consultation to his family business, watch television, read, visit with friends and relatives, occasionally shop for groceries, and take his camper trailer camping with assistance from family members on at least two occasions.  (Tr. 132, 146-148).  *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).  Therefore, although it is clear that plaintiff suffers from some degree of pain and discomfort, he has not established that he is unable to engage in any and all gainful activity.  *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding

13

of disabled).  Neither the medical evidence nor the reports concerning his daily activities supports plaintiff's contention of total disability.  Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

### C.    RFC Determination:

We have also reviewed the ALJ's determination that plaintiff maintained the RFC to perform a full range of light work.  It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).  The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000).  Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.154599(c), while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional.  *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs*., 662 F. Supp. 954, 955, 956 (W.D. Ark. 1987) (RFC was "medical question," and medical evidence was required to establish how claimant's heart attacks affected his RFC).

In the present case, the ALJ considered the medical assessment of a non-examining agency medical expert, the medical assessment of plaintiff's treating physician, plaintiff's subjective

14

complaints, and his medical records.  In response to interrogatories, medical expert Dr. Robert B.

Sklaroff, a hematologist, reviewed plaintiff's medical records and determined that there was

sufficient evidence to reach a  medical opinion as to plaintiff's medical condition between December

31, 1987, and September 30, 1993. (Tr. 1141).  Dr. Sklaroff opined that plaintiff had an impairment

related to congenital/hereditary immunemediated thrombocytopenia, exacerbated by infection.  (Tr.

1141).  However, he concluded that plaintiff did not have any work restrictions during the relevant

time period.  Although outside the time frame, Dr. Sklaroff noted that a March 2004 colonoscopy

and polypectomy was performed which did not result in excessive bleeding or clotting problems, and

also noted that plaintiff had sustained various cuts at work without experiencing clotting difficulties.

(Tr. 1084, 1142-1145).

It is also significant to note that plaintiff continued to working throughout the relevant time

period.  Because he was self-employed, it is impossible for the court to determine to the exact extent

of his work activity.[4]  Therefore, we will defer to the ALJ's determination that plaintiff's work

activity did not rise to the level of substantial gainful activity.  However, as previously noted,

plaintiff's continued work does evidence his ability to perform some level of work on a sustained

basis.  And, we note that plaintiff reported to his doctor that he spent a great deal of his time on his

feet while selling tools for drywalling.  (Tr. 375).

_____

[4]Ordinarily, in the case of self-employment, a sole-proprietor who holds all business licenses in his name,
who rents property, who conducts business on a day-to-day basis, and who is solely responsible for the operation of
the business would be considered engaged in substantial gainful activity under the criteria set forth in either test
provided for in 20 C.F.R. §§ 404.1575(a)(1),(2).

We note that Dr. Sandra Auvil, a doctor of internal medicine, completed a physical capacities evaluation in July 1997. (Tr. 557-561). She determined that plaintiff could sit for a total of four hours of an eight hour day, stand for a total of four hours, and walk for one hour. (Tr. 557-561). Dr. Auvil also opined that plaintiff could lift and carry up to twenty pounds occasionally, up to ten pounds frequently, and could only occasionally bend, squat, crawl, climb, and reach. (Tr. 559). Further, she indicated that plaintiff suffered from rather severe fatigue. (Tr. 561). Dr. Auvil stated that, due to his thrombocytopenia, plaintiff should avoid heavy physical labor, working with heavy machinery, or working at heights because of the risk of bleeding if injured. (Tr. 561). While we are cognizant of the fact that this opinion is much stricter than the one voiced by Dr. Sklaroff, we are also aware that Dr. Auvil's opinion was rendered in 1997, well after the expiration of the relevant time period. In fact, Dr. Auvil did not begin treating plaintiff until 1996, during the time frame when plaintiff's condition had begun to deteriorate. Therefore, while Dr. Auvil's assessment seems to have accurately reflected plaintiff's RFC in 1997, we cannot say it is also an accurate assessment of plaintiff's RFC in 1993. Accordingly, we agree with the ALJ's conclusion that Dr. Auvil's opinion was entitled to some weight but not determinative.

The remaining RFC assessments contained in the file also do not relate to plaintiff's condition during the relevant time period. As such, they too are not entitled to significant weight. Because the evidence clearly reveals that plaintiff was working and able to perform activities consistent with the definition of light work, we find that substantial evidence supports the ALJ's determination that plaintiff could perform a full range of light work.

16

**D.      Return to PRW:**

We also agree with the ALJ's determination that plaintiff could return to his PRW.  The regulations provide that vocational expert testimony may be considered in determining whether an individual can perform their past relevant work.  20 C.F.R. § 404.1560(b)(2) (determining whether you can do your past relevant work).  However, there is no requirement that an ALJ obtain vocational expert testimony before making a step four decision. *Lewis v. Barnhart*, 353 F.3d 642, 648 (8th Cir. 2003) (vocational expert testimony is not required at step four); *Banks v. Massanari*, 258 F.3d 820, 827 (8th Cir. 2001) (vocational expert testimony is not required at step four where claimant retains burden of proving inability to perform past relevant work); *Johnston v. Shalala*, 42 F.3d 448, 452 (8th Cir. 1994) (vocational expert testimony only required when burden shifts to Commissioner and individual has nonexertional impairment).

In the present case, the evidence reveals that plaintiff had PRW experience as yard manager (light work); drywall salesperson; sales manager (sedentary work); merchandise manager (sedentary work); and ,consultant (sedentary work).  (Tr. 118, 647, 1207-1208).  Given plaintiff's RFC to perform light work, the ALJ properly determined that plaintiff could perform his PRW as a sales manager, merchandise manager, and/or consultant as he had previously performed these positions or as they are  generally performed in the national economy.  (Tr. 118, 618-620, 647-648, 68, 1207-1208). *See* DOT at 107, 135, 153.  Precedent states that an individual is not disabled if they retain the capacity to perform either their PRW as it was actually performed, or as it is generally performed

17

in the national economy.  *Evans v. Shalala*, 21 F.3d 832, 833-834 (8th Cir. 1994) (quoting SSR 82-61 (1982)); *see also* 20 C.F.R. § 404.1560(b)(2).  Therefore, the ALJ's decision will stand.

**IV.**    **Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this <u>20th</u> day of November 2007.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

18